## CHAS. MADDOX *et al.* v. STATE.

No. A-1985.   Opinion Filed April 17, 1914.

(139 Pac. 994.)

1.  **LARCENY—Appeal—Judgment—Sufficiency of Evidence.** (a) A judgment of conviction will not be reversed by this court on any controverted question of fact, when the testimony in the record tends reasonably to support the finding of the jury.

    (b)   For facts sufficient to support a conviction, see opinion.

2.  **APPEAL—Change of Venue—Discretion—Hearing.** (a) An application for a change of venue, under the law of Oklahoma, is addressed to the sound discretion of the trial court, and the rulings of the trial court thereon will not be disturbed by this court, unless all the circumstances disclosed by the record clearly indicate arbitrary action and abuse of discretion on the part of such court.

    (b)   A trial court may, in its discretion, examine any person or persons it may desire, for the purpose of determining the merits of an application for change of venue, and is not limited under our law to examination only of such persons as file affidavits in support of the application. The law contemplates that the court will avail itself of all reasonable opportunity to determine the right of the accused to a change of venue, as well as the right of the people to resist the same; it being the object and purpose of the law to secure to the accused a fair and impartial trial. and the right of the people to have such trial at a minimum expense.

3.  **CONTINUANCE—Grounds.** The rule laid down by this court in Madison v. State, 6 Okla. Cr. 356, 118 Pac. 617, Ann. Cas. 1913C, 484, does not support the contention that an accused has the right to a continuance and to the delay of his trial for the personal appearance of witnesses who are beyond the jurisdiction of the courts of this state, and an application for continuance, based on any such contention, is properly overruled.

*Appeal from District Court, Washita County;*
*James R. Tolbert, Judge.*

Charley and Roy Maddox were convicted of larceny, and appeal.   Affirmed.

*Swan C. Burnette* and *J. L. Austin,* for plaintiffs in error.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J.   The plaintiffs in error, Charles Maddox and Roy Maddox, were convicted at the October, 1912, term of district court of Washita county, on a charge of larceny of domestic animals, and their punishment fixed at imprisonment in the state penitentiary for a term of three years.   The information in usual form charges the plaintiffs in error with having stolen eight head of cattle in Washita county, in November, 1910.

The material evidence in behalf of the state may be epitomized as follows:

Ben Chappelear, an admitted accomplice, testified to the following material facts: That he had lived in Washita county for seventeen years; that he knew Charlie and Roy Maddox; had known them for fifteen years; that he lived near the same town in which they lived; that he knew James Hogan and had known him for a few months; that he saw Roy and Charlie Maddox in Cordell and went with them to a place near Bessie; that they were on horseback; that they went to this place just after dark; that they went by the town site of Bessie, turned west to a creek, then north, and entered a pasture along by the creek, where they took nine head of cattle and drove them to Cloud Chief. The witness described minutely the route over which the cattle were driven, and said they were all acting together in taking the same; that after taking the cattle they met some person east of Bessie in a buggy; they also met a man by the name of Link Stewart, while driving the cattle through Cloud Chief; that Roy Maddox was with him at this particular time; that he never saw the cattle except at night, and that one of them was a white-faced, wine black cow; that after they passed through the town of Cloud Chief they turned the cattle into a pasture adjoining the town site on the south; that a person by the name of Umick

had possession of the pasture at that time; that he did not know how far they had driven the cattle; that they were driven in the public highway most of the time; that he did not know at the time to whom the cattle belonged; that he was riding a spotted horse on the night of the theft, and that he and the Maddox boys did not leave together, but met a short distance from the starting point; that all of this occurred in the fall of 1910, along about November; that after the cattle were put in the pasture he went home; that it was 12 or 1 o'clock at night when he left the pasture. On cross-examination he stated that he was not positive whether or not there were eight or nine head of the cattle. This witness admitted that he had had some trouble with the Maddox boys on account of money which he claimed they owed him which had not been paid.

Witness Joe Douglas testified that he knew the plaintiffs in error; that he remembered the occurrence of some cattle being put in a pasture at Cloud Chief in the fall of 1910 and afterwards recovered; that he had a conversation with Roy Maddox and conveyed certain information to state's witness Chappelear, at Maddox's request; that he was out near Cloud Chief on the morning after the cattle were stolen; that Maddox overtook him and asked him to tell Chappelear that a bunch of cattle had been stolen near Bessie the night before, and had been tracked down as far as a certain rock house the following morning.

State's witness Stewart testified that he lived at Cloud Chief, and that he knew Roy and Charlie Maddox; that he knew them in 1910; that he remembered hearing about some cattle being placed in a pasture near Cloud Chief and afterwards being recovered by one Hogan. Prior to hearing of this occurrence, he saw some cattle passing through Cloud Chief one night between 12 and 1 o'clock; that the next day he heard about cattle being put in a pasture adjoining town; that there were three parties driving the cattle which he saw, two of whom were Roy and Charlie Maddox; that a third man was farther away, and he could not tell for sure who he was; that he saw their horses; did not take any particular notice except to one of them; that

the horse farthest away from him was a spotted horse; that one of the cattle was white-faced; that he got out of the road to let them pass, and stood still until they went by; that he spoke to the people at the time and said, "You are pretty late getting in to-night, boys," but that none of them replied; that he had known Charlie and Roy Maddox for twelve years; that there were eight or nine head of cattle in the bunch; that he remembered the hour of the night because he and a man named Borrel had worked on some gin books until the clock struck twelve; that they stopped work and smoked a cigar; that they stayed there perhaps five minutes longer; that he got up and took the books under his arm and started home and met these people; that he told J. P. Stubblefield next morning, when he went to the gin, about the occurrence, also told Mr. Holt and the deputy sheriff stationed in the town. There was some testimony indicating that this witness and the plaintiffs in error were not on the best of terms, growing out of some debts owed by the plaintiffs in error to him.

Witness Chappelear was recalled and testified that, at the time they passed witness Stewart, Roy Maddox was closer to Stewart, Charlie next, and that he was farther away and riding a spotted horse, as testified to by Stewart.

Witness Hogan, the owner of the cattle, testified that he lost eight head of cattle in November, 1910; that they were in a field near Bessie; that he found the cattle near Cloud Chief in a stalk field, or pasture, which adjoined the town on the south. One of the cows was a wine black cow, most of them were red; he found them on the evening after Thanksgiving; that he never missed them until Friday; that the cattle were taken without his knowledge and consent; that he did not know who took them. This witness testified that one of the cattle belonged to him, and that he owned a half interest in the others.

On behalf of plaintiffs in error, Charles Maddox testified that he did not have any connection of any kind with the theft of the cattle; did not know anything about it whatever; never had any arrangements of any kind with Ben Chappelear or any one else involving the cattle in question; never met him any-

where for the purpose of stealing the cattle in question; that he was not in Cordell at the time Chappelear said he was; that he could not tell where he was at that time; that he heard Stewart's testimony; that he was not where Stewart said he was at the time detailed by Stewart; that he never had at any time driven any cattle to Cloud Chief in company with his brother and Chappelear, under the circumstances detailed by witness Stewart; that the first knowledge he had of the theft came to him after the cattle had been found and driven back to Bessie; that he did not know just when he heard about it; that he never saw the cattle that he knew of.

Roy Maddox, the other plaintiff in error, testified that he never had any connection with the cattle in any manner; that he was not in Cordell with Ben Chappelear and his brother; that he was in Cordell the day before the cattle were stolen; that he saw Chappelear in the livery barn; that he got into town about 1 and left about 4 o'clock, going home; that Chappelear was in the barn when he left; that he heard about the cattle being in a pasture near Cloud Chief the next evening after he was in Cordell; that he stayed at home the night before the cattle were discovered near Cloud Chief; that he heard the testimony of witness Stewart; that if he had ever met Stewart or any one else under circumstances such as those detailed by Stewart, he had forgotton it; that he was not driving the cattle as testified to by Stewart.

Witness McClanahan testified that he knew Charley and Roy Maddox; that he remembered hearing of the cattle in Umick's pasture near Cloud Chief; that he lived in the northwest corner of the town site; that he never did see the cattle; that he heard of these cattle being there one morning; that he was at the home of Roy Maddox on the evening prior to that time; that Maddox was at home; that he did not remember the exact time Maddox arrived, but that it was before night; that he was working for Maddox at the time; that he stayed at the Maddox home until after 12 o'clock, leaving between 12 and 1

o'clock the night previous to the time he heard the cattle were discovered in a pasture near Cloud Chief.

Mrs. McClanahan, in behalf of the plaintiffs in error, testified that she lived near Cloud Chief in November, 1910; that she remembered the circumstances of some cattle being found in a pasture south of town; that she was at the home of Roy Maddox the evening and night prior to the time that she heard the cattle were so discovered; that she left Maddox's home about 11 or 12 o'clock at night, and Maddox was there when she left.

Upon these facts, the case was submitted to the jury, and a verdict of guilty rendered.

When the case was called for trial, counsel filed in behalf of plaintiffs in error a petition for a change of venue, which was submitted to the court upon affidavits and oral testimony, both in favor of the petition and against the same. The court, after hearing the matter in detail, denied the petition, and, in our judgment, properly so. Counsel contend that the statute contemplates an examination of those persons only who filed affidavits in support of the petition of plaintiffs in error, and not the examination of any other witness.

The rule announced by this court in *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, and again in *Tegeler v. State,* 9 Okla. Cr. 138, 130 Pac. 1164, answers this contention conclusively. In those cases we said:

"Under this statute, the state may file counter affidavits stating any fact or facts that would show that a change of venue was not necessary. If the court is of the opinion, upon an inspection of the affidavits filed in support of any in opposition to a motion for a change of venue, that a change of venue should not be granted, then it should be so ordered; but, if the court is not satisfied on this question, it may have all of the parties making these affidavits on both sides, and such other persons as the court may think proper, sworn as witnesses and examined in open court touching the matter in controversy. The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed, and, if this is not true, the burden is upon the defendant to establish his right to a change of venue. The granting of a change of venue is by the Constitution and statute made discretionary with the

trial court, and this court will not reverse a ruling of the trial court denying an application for a change of venue, unless it is made clearly to appear that there has been such an abuse of this discretion as to amount practically to a denial of justice. By abuse of discretion is meant a clearly erroneous conclusion and judgment; one that is clearly against the logic and effect of the facts presented in support of and against the application. Whatever the decisions in other states may be, this is not an open question in Oklahoma." (*Black v. State,* 3 Okla. Cr. 547, 107 Pac. 524; *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300.)

It is contended by counsel for plaintiffs in error that the court erred in denying a continuance upon the application of the plaintiffs in error. The application is based on an affidavit alleging that material witnesses were absent and could not be had, at the time of court then in session. The record shows, and it is not denied, that these witnesses were nonresidents of Oklahoma. The testimony which the plaintiffs in error expected to produce by said witnesses is not set out in narrative form. The county attorney, when the application was interposed, consented and agreed that the facts set out in the application for continuance should be submitted and read in evidence as the depositions of the absent witnesses, in so far as the testimony offered was competent. Thereupon the court denied the application for continuance, and the cause proceeded to trial.

Counsel contended that the accused had the constitutional right to have the personal presence of the witnesses, and that the order requiring them to go to trial without the production of the witnesses, under process of the court, was a denial of this right. Counsel attempts to justify this contention by the rule announced in *Madison v. State,* 6 Okla. Cr. 356, 118 Pac. 617, Ann. Cas. 1913C, 484.

The doctrine in the Madison case does not, in any reasonable interpretation of the rule it announces, support the contention made in the case at bar. In the Madison case the witnesses were within the jurisdiction of the court before whom the case was on trial, and as a matter of fact were within the limits of the city within which the case was being tried; but they were sick

and conclusively shown to be unable to attend in person at the trial, and on that account a continuance was asked until such time as these witnesses could appear. The reason for the rule there announced and the authorities supporting the same are clearly set forth in that opinion, and it requires no discussion at this time to point out to a discriminating mind the difference in the doctrine of that case and the rule contended for in the case at bar. The witnesses were nonresidents of Oklahoma, and there is no law whereby they could be forced to appear in person and testify before an Oklahoma court. In such cases the law has provided for the taking of their depositions, and, upon a showing of proper and diligent effort in their behalf, that privilege must be allowed. See *Smith v. State, ante,* 139 Pac. 709.

Under the showing made, the county attorney was exceedingly liberal when he consented and agreed that the application for continuance could be read in evidence as the deposition of the absent witnesses, because the showing made and relief sought by the plaintiffs in error was not such relief as they were entitled to receive. They did not ask for an opportunity to take depositions nor make any showing as to why such depositions had not already been taken, but assumed the absurd position of insisting that a court should continue a case and wait the good pleasure of nonresident or absconding witnesses whom he could not by any rule of law compel to voluntarily return and offer their testimony. The contention is too ridiculous to be entitled to serious consideration. There was no allegation in the application for continuance that the defendant expected the return of the witnesses, nor any reasonable showing made that he ever intended to produce them or make any effort to do so. The Supreme Court of Washington, in the case of *State v. Hutchinson,* 14 Wash, 580, 45 Pac. 156, in disposing of this identical question, used the following language:

"The prosecuting attorney offered to admit, under section 338 of the Code of Procedure, that such testimony would be given, but defendant attacks this statute as unconstitutional. However it may be held as to witnesses within the state, it certainly could not be unconstitutional as to witnesses without the state, whose attendance the court could not compel, for as to these

the defendant would only have the right to take their depositions; and an admission by the state that they would testify to the facts sought to be proven by them would be of as much benefit to the defendant as though the same appeared in a deposition."

Counsel next contend that the evidence is not sufficient to support the verdict. With this contention we cannot agree. The evidence was sufficient to warrant the trial court in submitting the cause to the jury, under proper instructions, which he did. The controverted questions of fact and the credibility of witnesses are clearly questions for the jury. In our judgment the conviction was not only warranted by the evidence, but any other verdict would have been a miscarriage of justice.

The record has been carefully examined in detail, and we find no error disclosed thereby prejudicial to the substantial rights of the accused.

The judgment is therefore affirmed.

DOYLE, J., concurs; FURMAN, J., not participating.